Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 4937 | **DATE** | 10/16/2001 |
| **CASE TITLE** | Fedanzo vs. Vroustouris, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in this Court's Memorandum Opinion and Order, this court grants defendants' motion for summary judgment and enters judgment in favor of defendants. The City of Chicago's motion to strike the official capacity claims against the individual defendants is denied as moot. (14-1,11-1)

Docketing to mail notices.
Mail AO 450 form.
Copy to judge/magistrate judge.

TP courtroom deputy's initials

date mailed notice

Date/time received in central Clerk's Office

mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

JOSEPH S. FEDANZO, )
)
    Plaintiff, )
)
)    No. 00 C 4937
v. )
)    Judge John A. Nordberg
ALEXANDER VROUSTOURIS, in his official )
capacity as Inspector General, JAMES TAGGART )
and JOHN GASIOROWSKI in their official )
capacities as Deputy Inspectors General, THE )
CITY OF CHICAGO, a municipal corporation, )
LOUIS KUSZYNSKI, and STEVEN HOOGLAND )
in their individual capacities as employees of )
the City of Chicago, )
)
    Defendants. )

DOCKETED OCT 17 2001

## MEMORANDUM OPINION AND ORDER

Plaintiff Joseph Fedanzo has filed a complaint under 42 U.S.C. § 1983 alleging that his Fourth Amendment liberty rights were violated when his public employer attempted to interview him during working hours about whether he was complying with one of its personnel rules. Defendants have moved for summary judgment. For the reasons set forth below, the motion is granted.

## BACKGROUND

In March 1991, plaintiff began working as an electrical mechanic for the City of Chicago. During the time period relevant to this lawsuit, plaintiff was working for the City's Department of Aviation at Terminal 1 of O'Hare's International Airport. He was a member of the

-1-

International Brotherhood of Electrical Workers ("IBEW") Local 134, which had entered into a collective bargaining agreement with the City. As a condition of his employment, plaintiff was required to reside within the City limits.

On November 3, 1997, the City's Office of Inspector General ("OIG") received an anonymous tip that plaintiff was no longer residing within the City but instead was residing in Villa Park, Illinois. The OIG is responsible for investigating whether City employees are in compliance with this residency rule. In December 1997, the OIG opened an investigation into the matter, which was led by defendant James Taggart who was a Deputy Inspector General with the OIG. Defendant John Gasiorowski, who also was a Deputy Inspector General, assisted in the investigation. The OIG conducted surveillances of plaintiff's alleged Chicago residence and his Villa Park residence for almost a year. In addition, investigators gathered documentary evidence including postal records, property deeds, real estate tax bills, voter registrations, and vehicle titles.

By October of 1998, the OIG had strong evidence that plaintiff was violating the City's residency rule. Taggart and Gasiorowski decided that it was time to interview plaintiff about the matter. They decided to conduct an interview on October 22, 1998. A few days prior to that date, Taggart asked two OIG investigators – defendants Louis Kuszynski and Steven Hoogland – to approach plaintiff when he arrived for work on the 22nd and to bring him to the OIG's offices located in Terminal 2 of O'Hare's airport.

On October 22, 1998, plaintiff drove into the employee parking lot located on the O'Hare grounds, arriving sometime between 6:45 a.m. to 6:50 a.m. He was scheduled to be at work at 7:00 a.m. at Terminal 1 and normally worked from 7:00 a.m. until 3:00 p.m. As he was getting

out of his car, Kuszynski and Hoogland drove up directly behind his car. The two men flashed their OIG badges and then asked plaintiff to get into their car. They drove plaintiff over to the OIG's office at Terminal 2, which was approximately 2 miles from the parking lot. The drive took about 10 minutes, and the three men walked into the OIG's office at approximately 7:05 a.m.

In his later testimony before the Illinois Local Labor Relations Board, plaintiff described this initial encounter in the following terms:

> Well, I got out of my car, just like normal to go punch in. The guys started approaching me. I said, "Who are you?" It was a little dark out at the time. He just flashed a badge and said, "Come with me." []
>
> I said, "Well, can I at least punch in or notify my supervisor, let someone know what's going on?" He said, "No, don't worry about that. Get in the car." []
>
> Then they put me in the backseat, and we proceeded to drive over to – well, I didn't know where I was going at the time. As we were driving, I said, "Where are you taking me?" You know, "What's going on?" []
>
> They said they were taking me to Terminal 2. []
>
> After we started driving, I had a card, a union card. I handed it to the gentleman in the passenger seat, said, "I want my [Business Agent] present." I guess he looked it over real quick and tossed it back and said, "We don't deal with that."

(2/24/00 LLRB Tr. at 38-43.)

After plaintiff and the two investigators arrived at the OIG's office, plaintiff was taken to one of the three interview rooms located there. The OIG's office is located on the basement level of Terminal 2 and consists of a common area with three adjoining interview rooms. There are no windows in the rooms. Plaintiff testified that the office looked like a little storage room that had been converted to an office.

Plaintiff says that he waited for 10 or 15 minutes in the office until Taggart and Gasiorowski arrived.[1] The defendants claim that the two men were already there when plaintiff arrived. Either way, it is agreed that the two men introduced themselves and attempted to interview plaintiff in one of the interview rooms. Plaintiff states that the men closed the door behind them. Gasiorowski began by advising plaintiff of his "administrative rights," which informed him (among other things) that any statement he made could be used against him for the purposes of removing him from his job and that he had the right to a union representative or counsel of his choosing to be present at the interview.

Plaintiff immediately invoked his right to call a union representative. Taggart then took plaintiff to another room in the office so that he could talk to his union representative in private.[2] Plaintiff called his father, Michael Fedanzo, who was an official in plaintiff's union – IBEW Local 134. After speaking with his father, plaintiff handed the phone to Taggart. Plaintiff's father told Taggart that he was coming to the office right away. Plaintiff returned to the common area of the office to await for his father.

Five minutes later, plaintiff's foreman, Richard Frederickson, arrived at the OIG office

---

[1] This fact comes from plaintiff's testimony at the LLRB hearing. In his statement of additional material facts, plaintiff stated that he waited for 45 minutes for the two men to show up. This latter assertion is directly contradicted by his LLRB testimony and therefore will be disregarded. *Cf.* LLRB Tr. at 50 (plaintiff testified: "we waited about 15 minutes, 20 minutes passed, and then Mr. Taggart and Mr. Gasiorowski showed up") *with* Pls. Statement of Additional Facts, No. 10 ("Taggart and Gasiorowski arrived after Fedanzo had been waiting approximately 45 minutes.").

[2] In his response brief, plaintiff says that he was only allowed to call his union representative "under supervision" of the defendants. However, in his response to the defendants' statement of material facts, plaintiff never objected to the defendants' statement number 19, which clearly states that the defendants "stepped out of the room" so that plaintiff could call his union representative "in private."

and announced that he had been sent to sit with plaintiff until his union representative arrived. While waiting for plaintiff's father to arrive, Frederickson, Taggart, and Gasiorowski talked about the World Series baseball game played the night before and other incidental matters. There was no discussion about the substance of the investigation.

Plaintiff's father arrived at around 8:00 a.m. and was allowed to talk privately with his son. Taggart and Gasiorowski then attempted to resume the interview. They again read plaintiff his "administrative rights." Taggart began the interview by asking plaintiff some background questions about his social security number and the like, which plaintiff answered. Gasiorowski then attempted to ask plaintiff about the substance of the investigation. Before plaintiff could answer any of these questions, his father interrupted and said that his son would not answer any such questions. Plaintiff's father told him to leave the room.

After plaintiff was out of the room, Taggart, Gasiorowski and plaintiff's father discussed whether plaintiff was required, as a condition of employment, to answer questions about his residency. A few minutes later, without resolving this question, the investigators concluded that it would be better to simply schedule an interview on another date. The October 22nd interview therefore terminated at approximately 8:20 a.m.

In March 1999, plaintiff was discharged from his job for violating the City's residency rule. He appealed his discharge to the City's Personnel Board, which conducted a hearing and upheld his discharge on February 15, 2000. In May 2000, plaintiff appealed the decision of the Personnel Board to the Circuit Court of Cook County. On January 12, 2001, the Circuit Court of Cook County denied plaintiff's petition for administrative review.

Also in March 1999, plaintiff's union filed charges with the Illinois Local Labor Relations Board. The union alleged that plaintiff's October 22nd interview violated the Illinois Public Labor Relations Act because plaintiff asked to speak with his union representative in the car ride over to Terminal 2 and was not allowed to speak to his representative until sometime after he arrived. After a hearing, an administrative law judge recommended dismissal of the charges on April 17, 2000.

On August 11, 2000, plaintiff filed his complaint in this court under § 42 U.S.C. § 1983 alleging that the defendants violated his Fourth Amendment liberty rights. Plaintiff seeks $100,000 in compensation for the "anguish and mental trauma" he suffered, $10,500 in lost wages, and $100,000 in punitive damages.

## **DISCUSSION**

This case covers a very narrow time frame consisting of a one and half hour period on the morning of October 22, 1998. The facts are not complicated and not really in dispute. Stated in summary fashion, two City investigators picked up plaintiff from the employee parking lot as he arrived for work and drove him to a nearby office for an investigatory interview. After several attempts to question him, the City investigators aborted the interview effort when plaintiff's father made it clear that plaintiff would not answer any substantive questions concerning the investigation. Plaintiff alleges that he never consented to this interview and was forced against his will to cooperate.

After reading the entire record, we are hard pressed to understand how this incident (even assuming it was a Fourth Amendment violation) amounts to the type of "major league" violation that plaintiff claims it is, justifying $100,000 in compensatory damages, $10,500 in lost wages,

and $100,000 in punitive damages. It is undisputed that the encounter lasted no longer than an hour and a half and took place during plaintiff's normal working hours. Plaintiff was never physically threatened nor verbally harassed. He was paid for a full 8-hour shift on the 22nd and therefore lost no pay for the time he spent in the interview. Nothing he said was ever used against him at his later termination hearing. During this same time period, he would have been doing his regular work at the same general physical location. Thus, at best, plaintiff's claim is one that falls on the low end of the spectrum of Fourth Amendment violations.

Based on the amount of damages being sought and some harsh rhetoric in plaintiff's response brief, one has to wonder whether plaintiff is complaining about something greater. The defendants think so. They argue that plaintiff is really upset about the City's decision to fire him and that he wants to re-litigate the state court's determination that his firing was justified. Therefore, as one argument for summary judgment, defendants rely on the Rooker-Feldman doctrine, which holds that a federal district court should decline jurisdiction over claims that would require the federal court to review the decision of a state court. *See generally Edwards v. Illinois Bd. of Admissions To The Bar*, 261 F.3d 723, 728 (7th Cir. 2001).

There is some indirect evidence suggesting that plaintiff's current lawsuit may be motivated by his anger over the City's decision to fire him. As we have noted, the damages requested seem disproportionate to the alleged wrong. Also, in his response brief, plaintiff makes a number of disparaging comments attacking the legitimacy of the residency rule that led to his firing. *See, e.g,* Pls. Resp. at 8 ("Apparently where City employees sleep and who they sleep with must be of critical importance to Mayor Daley's ability to effectively govern the City."). Finally, there is a question of timing. Plaintiff did not file this lawsuit soon after the

October 22, 1998 incident. Instead, he waited to file this lawsuit until he had exhausted all of his other available legal remedies, which included his appeal of the termination decision through the state court and his union's claim before the LLRB. However, even if all the above points are true, they are not sufficient grounds by themselves for dismissing this case.

Under Rooker-Feldman, the relevant inquiry centers on whether his current claim is inextricably intertwined with the previously-litigated state court claim and would, in effect, overturn that decision. *Edwards*, 261 F.3d at 729. After reading plaintiff's complaint, we conclude that the Rooker-Feldman doctrine is inapplicable here. Although plaintiff obviously believes he was wrongly fired, he does not seek reinstatement of his job in his current lawsuit. Moreover, the resolution of his claim does not hinge upon the correctness of the state court ruling. There would be no logical or legal inconsistency in holding that the City was both justified in firing plaintiff (the state court determination) but was unjustified in the way it treated him on the 22nd (the federal claim).

Having noted these initial concerns, we now examine the specific legal question of whether the City's investigators violated plaintiff's Fourth Amendment liberty rights on the morning of October 22, 1998. The Fourth Amendment protects people from "unreasonable searches and seizures." U.S. Const. amend. IV. In order to state a cause of action under the Fourth Amendment, the defendant's conduct must constitute a seizure and that seizure must have been unreasonable in light of the circumstances. *Brokaw v. Mercer County*, 235 F.3d 1000, 1010 (7th Cir. 2000). Defendants argue that there was no seizure and that, even if there was, it was reasonable.[3]

---

[3]The individual defendants also argue that they are entitled to qualified immunity.

We will address the "seizure" argument first because the constitutional protections of the Fourth Amendment do not even come into play unless there has been a seizure. Stated in general terms, a seizure occurs when a person's "freedom of movement" is restrained either by "physical force" or a "show of authority." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). In *Mendenhall*, the Supreme Court discussed whether a seizure occurs when a police officer approaches a person in a public place and seeks to ask her questions. Although one could argue that there is an inherent show of authority in such a situation, the Court held that a citizen-police encounter does not constitute a seizure by its very nature. A person approached by a police officer might choose to voluntarily cooperate with the officer. The Court thus held that a seizure occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554.

Both parties agree that this "free to leave" formulation is the relevant standard for determining whether there was a Fourth Amendment seizure in this case. Because this question is context-dependent, courts have developed various factors to answer the question. In *Mendenhall*, the Supreme Court provided the following "initial" examples:

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Id.* Over the years, courts have elaborated upon these initial examples and have developed a list of factors to guide the inquiry. In *United States v. Scheets*, 188 F.3d 829 (7th Cir. 1999), the Seventh Circuit summarized these factors as follows:

> whether the encounter occurred in a public or private place; whether the suspect was informed that he was not under arrest and free to leave; whether the suspect consented or refused to talk to the investigating officers; whether the investigating officers removed the suspect to another area; whether there was physical touching, display of weapons, or other threatening conduct; and whether the suspect eventually departed the area without hindrance.

*Id.* at 836-37.

Plaintiff relies on the above analytical framework and argues that, when the factors summarized in *Scheets* are considered in light of the undisputed facts of this case, it is clear that he was seized on the morning of the 22nd. The problem with plaintiff's argument is that he ignores the fact that this case takes place in the employment setting and argues as if it were a traditional Fourth Amendment case involving a police-citizen encounter in a public area such as an airport concourse or bus station terminal. However, as discussed in more detail below, it is impossible to properly analyze the alleged seizure in this case without accounting for the fact that the it occurred during a public employer's investigation into work-related misconduct and did not involve an police investigation into criminal violations.

The factors set forth in *Scheets* were generally developed in the traditional context involving police-citizen encounters. There are fewer cases addressing a Fourth Amendment claim in the employment context, perhaps because the Fourth Amendment is only applicable to public employers, and the great majority of these cases address either searches of employee's desks or drug testing.[4]

---

[4] In fact, the parties only cite to two cases involving a Fourth Amendment liberty claim in the context of a work-related investigatory interview. Each side cited to one case in supporting its position, and the two cases reach opposite conclusions on similar facts. Defendants rely on *Simpkins v. Sandwich Community Hosp.*, 854 F.2d 215 (7th Cir. 1988), in which the Seventh Circuit stated in a very brief discussion that a nurse working for a private hospital was not "seized" under the Fourth Amendment when she was approached by a state investigator in the

-10-

Even though this area of the law is less developed, it is clear that the fact that the alleged seizure took place in the context of the employment relationship complicates the traditional analysis and, in our opinion, makes it more difficult to prove a Fourth Amendment liberty violation. In *O'Connor v. Ortega*, 480 U.S. 709 (1987), the Supreme Court made this general point in analyzing a Fourth Amendment claim arising out of a public employer's search of an employee's desk and office as part of a work-related investigation. A plurality of the Court noted that, although public employees retain some of their Fourth Amendment rights in the employment context, these rights are "reduced by virtue of actual office practices and procedures, or by legitimate regulation." *Id.* at 717; *see also id.* at 725 ("the privacy interests of government employees in their place of work [] are far less than those found at home or in some other contexts"). The plurality also noted that a supervisor's investigation into work-related misconduct is "substantially different" from a police officer's investigation into criminal violations. *Id.* at 724.

---

employee parking lot in connection with an investigation into her drug record-keeping, threatened with arrest and the loss of her job, and then interrogated inside the hospital. *Id.* at 216-17, 219. Plaintiff relies on *Angara v. City of Chicago*, 897 F.Supp. 355 (N.D. Ill. 1995), in which a district court denied a motion to dismiss a Fourth Amendment claim in a case involving similar facts – *i.e.* the plaintiff had alleged that the OIG investigators approached him in the parking lot; "ordered [him], against his will, to get into a car;" took him to another building; placed him in a windowless room; and then attempted to coerce a confession from him when they knew that he had done nothing wrong. *Id.* at 358. Both cases contain very brief discussions of the applicable standards, and we have therefore chosen not to rely heavily on them. To the extent that we were to rely on just these two cases, the defendants would obviously have the better argument given that we are bound to follow the Seventh Circuit's holding in *Simpkins* rather than the district court's holding in *Angara*. Moreover, it should be noted that the district court in *Angara* addressed a motion to dismiss rather than, as here, a motion for summary judgment.

In light of this general principle, we now turn to the specific facts and arguments relied on by plaintiff. Plaintiff claims that, during this one and a half hour period, his freedom of movement was restricted and he was not free to leave. Plaintiff does not allege that he ever explicitly asked to leave – except, of course, at the end of this time period when he in fact was allowed to leave. Instead, plaintiff relies on the various contextual factors set forth in *Scheets* and argues that he would have been unable to leave if he had tried to do so. Plaintiff's claim covers two parts: (i) the period in the parking lot and the drive over to the OIG office, and (ii) the period in the OIG office.

We will first look at the initial encounter, which lasted from 10 to 15 minutes. Plaintiff relies on the following facts. Two men drove into the parking lot and parked their car behind his, blocking him in. They were "big men." They flashed their badges at him and "ordered" him to get into their car. They did not tell him where he was going. He was unsure who they were and thought they might be police officers. When he asked if he could punch in and speak to his supervisor, they said no. They "transported him miles away" to the OIG office. They did not respond when he asked during the car ride whether he could speak to his union representative.

The above facts, when construed in plaintiff's favor, do not constitute a seizure. As an initial point, we cannot accept plaintiff's claim that he did not know who the men were and thought they might be police officers. When he was approached by the two men, he asked whether he should first punch in to work. During the car ride, he asked to talk to his union representative. These statements indicate that he knew the two men were working for his employer and are not the type of statements a person would make if he believed he was being approached by a police officer.

-12-

Plaintiff's other arguments regarding the initial encounter likewise are unavailing. First, plaintiff argues that he felt he could not leave because the investigators parked their car behind him, thus preventing him from driving away. In emphasizing this point, plaintiff is clearly trying to rely on the line of cases finding a seizure occurred based on the fact that a police officer strategically parked his car in a way to prevent a suspect from fleeing in his car. However, those cases usually involve a police stop of a car on a public street in a situation where it is reasonable to assume that the person in the car would have wanted to drive away. In contrast here, plaintiff had just parked his car in the employee parking lot and was about to begin an 8-hour shift when the investigators blocked in his car. So the issue is not really whether plaintiff could have driven back out of the employee parking lot, something he has never claimed he wanted to do, but whether he was free to walk into work in the way he normally did. Plaintiff has not argued that the two investigators physically positioned themselves in a way to prevent him from doing so.

Second, plaintiff says that he asked the two men if he could punch in and talk to his supervisor and they refused to let him do so. Plaintiff's later testimony on this point suggests something more benign. Plaintiff testified: "I said, 'Well, can I at least punch in or notify my supervisor, let someone know what's going on?' He said, 'No, don't worry about that. Get in the car.'" (2/24/00 LLRB Tr. at 38.) The phrase "don't worry about that" sounds less like the dictatorial order plaintiff makes it out to be and more like a reassurance that plaintiff would not lose any pay for failing to punch in, something which turned out to be true.

Third, plaintiff says that he was taken from a public space (the employee parking lot) and "transported miles away" to a private space (the OIG office). In describing his encounter in such terms, plaintiff is seeking to fall within the first and fourth *Scheets* factors, which ask "whether

-13-

the encounter occurred in a public or private place" and "whether the investigating officers removed the suspect to another area." *Scheets*, 188 F.3d at 836-37. This is another example of where plaintiff ignores the employment context and attempts to shoehorn the facts of his case into the pattern of traditional Fourth Amendment cases. These two factors typically come into play when an officer approaches an individual in a public place like an airport terminal or bus station and then asks the person to go to a private area of the airport. *See, e.g., United States v. Withers*, 972 F.2d 837, 842 (7th Cir. 1992) ("The entire encounter occurred in a public O'Hare International Airport concourse – [the suspect] was not coerced to move to a private area of the airport.").

In contrast here, the public/private distinction is less meaningful. The encounter began in the employee parking lot. The interview was conducted in an office in Terminal 2 where plaintiff sometimes worked. Thus, all of the events took place in the physical confines of the overall workplace. Plaintiff cannot claim that he was taken to a strange place in the same way that a member of the flying public could claim if escorted to a private area of the airport after disembarking from a plane. Plaintiff dramatically claims that he was transported "miles away." However, given the layout at O'Hare, almost any place would have been "miles away" from the employee parking lot, presumably also including Terminal 1 where plaintiff regularly worked.

Fourth, plaintiff asserts that the two investigators failed to respond during the car ride when he gave them his union card and asked to speak to union representative. It is hard to see how the investigators' response (they simply handed back the card and said "we don't deal with that") establishes coercion. At this point, plaintiff was already in a moving car. Once at the OIG office, plaintiff was allowed to call his union representative. Moreover, plaintiff's union filed a

-14-

claim based on this allegation and the administrative law judge denied the claim.

With regard to the period at the OIG office, plaintiff's seizure argument is even weaker. He relies on only a few facts. He says that he had to wait 15 minutes before Taggart and Gasiorowski arrived and during that time one of the two investigators remained with him. He was put in a windowless room. The investigators closed the door to the room when they interviewed him.

These facts are not enough to establish a seizure especially when they are balanced against the other undisputed facts. The interviewers read plaintiff his "administrative rights" on two occasions. When plaintiff invoked his right to have a union representative present, they honored that request. The interviewers did not object when plaintiff's foreman came into the office to sit with him while he waited for his union representative to arrive. For approximately 45 minutes – about half of the time of the entire encounter – plaintiff sat on a couch waiting for his father to arrive and listened to conversations about the World Series and other non-substantive matters. Plaintiff's union representative, who also is his father, arrived at about 8:00 a.m. Thus, for much of the time at the OIG office, plaintiff was in the presence of either his foreman or his union representative, both of whom were there to protect his rights. Thus, contrary to plaintiff's arguments in his response brief, he was not "held incommunicado."

Most importantly of all, plaintiff controlled when the interview ended. After choosing to answer a few initial questions, plaintiff (through his father) indicated that he would not answer anymore questions. The investigators honored that request and scheduled an interview for a later date. The fact that plaintiff was allowed to leave the first time he explicitly asked to do so undercuts his claim that he was being held against his will. In sum, there is simply no evidence

that the investigators used any strong-arm tactics nor even much evidence that they treated plaintiff in a rude manner.[5]

This case illustrates the difficulties in asserting a Fourth Amendment liberty claim in the workplace. For one thing, the Fourth Amendment protects the public employee's liberty – *i.e.* his "freedom of movement." *Mendenhall*, 446 U.S. at 553. At the same time, employment by its very nature restrict an employee's freedom of movement and choice. An employee comes to work and is told by a supervisor where to go and what to do. A supervisor may even use a harsh tone of voice and occasionally may "order" an employee to do something. However, no one would think to argue in this situation that the employee was "seized" under the Fourth Amendment. This is because the employee consents to a reasonable curtailment of his freedom of movement during working hours in exchange for a payment of salary. Thus there is an operating assumption that a supervisor will make demands upon an employee and that an employee who complies with those demands is doing so voluntarily. In light of this assumption, we should not lightly infer from various contextual factors – such as the supervisor's tone of voice – that a supervisor is holding an employee against his will.[6]

This general point was made in *Immigration and Naturalization Service v. Delgado*, 466 U.S. 210 (1984), where the Supreme Court considered whether there was a seizure when a

---

[5] Plaintiff has generally alleged that the OIG investigators treated other City employees in a harsh manner on prior occasions and that the City was forced to pay settlements in some of those cases. These allegations, even if they were substantiated, are irrelevant to the question of whether plaintiff was seized on the morning of the 22nd.

[6] We realize that plaintiff in this case was approached by two investigators and not by his normal supervisor. However, we do not think that this fact alters the basic analysis. It is undisputed that the investigators were working for the City and that they had the legitimate right to interview plaintiff in connection with their investigation.

-16-

number of armed INS agents made a surprise visit to a factory, placed agents near the exits to prevent workers from leaving, and then attempted to interview workers about their immigration status. *Id.* at 212. The workers alleged that they did not feel free to leave because the INS created "an intimidating psychological environment when it intruded unexpectedly into the workplace with such a show of officers." *Id.* at 216. The Court held that there was no "seizure" under these facts: "[o]rdinarily, when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers." *Id.* at 218. The Court thus recognized that the workplace normally restricts an employee's freedom of movement in a way that is clearly not a violation of the Fourth Amendment.

There is another difficulty with plaintiff's claim, which is the fact that it is difficult to distinguish between the apprehension he may have felt from the alleged restriction on his physical movement and the apprehension he undoubtedly felt from being the subject of a disciplinary investigation. Plaintiff claims that he felt apprehensive on the morning of the 22nd. We do not doubt this claim. However, as we have already noted, it seems unlikely that plaintiff's alleged mental trauma and anguish could have come solely from the fact that he was approached by two large men who blocked in his car or from any of the other contextual factors he has cited. Instead, the more likely source of his apprehension was the fact that he learned for the first time, on the morning of the 22nd, that he was the subject of a disciplinary investigation that eventually could lead to the loss of his job. He also undoubtedly knew that he would have to answer questions about the investigation because he was required as a condition of his employment to cooperate with any OIG investigation. As the administrative law judge who analyzed the union

claim stated, "[a]ny employee who is summoned to an investigatory interview is reasonably apprehensive because he perceives his employment may be in jeopardy." (4/17/00 ALJ Op. at 17.) This type of pressure should not be considered in the Fourth Amendment "free to leave" analysis because the employer has a legitimate right to investigate work-related misconduct.

Although not discussed by the parties in their briefs, there is one final difficulty with this type of claim, which is the fact that it encroaches upon an issue that was the subject of a collective bargaining agreement. This concern was raised in *Bolden v. Southeastern Penn. Transp. Authority*, 953 F.2d 807 (3d Cir. 1991). The Third Circuit concluded that "a public employee union acting as exclusive bargaining agent may consent to drug testing on behalf of the employees it represents," thereby preventing the individual employee from asserting a separate Fourth Amendment claim. *Id.* at 828. The Third Circuit explained its reasoning:

> Through collective bargaining, a public employer and union can reach agreement on detailed factual questions [] that may have important implications under the Fourth Amendment. If individual public employees may litigate such questions despite the resolution reached through collective bargaining, the utility of collective bargaining with respect to drug testing in the public sector would be greatly diminished.

*Id.*

A similar concern is raised here. Plaintiff was a member of a union that had a collective bargaining agreement with the City. Section 11.4 of this agreement is entitled "Conduct of Disciplinary Investigations." This section is four pages long and contains numerous rules to protect employees who are being interviewed by the OIG in connection with a disciplinary investigation. Among other things, the section states that such interviews should be take place during the employee's "day shift hours" and should take place at the employee's normal work

-18-

location. Plaintiff's current Fourth Amendment claim basically requires that we examine whether the City was reasonable in the way it conducted the investigatory interview. Plaintiff's Fourth Amendment claim covers many of the same issues addressed by the collective bargaining agreement and therefore raises a concern that we would be unwisely intruding into an area traditionally left to negotiation between the employer and union. *See Jackson v. Liquid Carbonic Corp.*, 863 F.2d 111, 118 (1st Cir. 1988) ("the collective bargaining agreement classically provides the context in which an employee's bona fide expectations of privacy and personal security in the workplace are arrayed against the employer's right to exercise supervision and control of a particular kind").

In sum, we conclude that plaintiff was not seized under the Fourth Amendment on October 22, 1998. Therefore, we will not consider the defendants' second argument that the seizure was reasonable.

## CONCLUSION

For the foregoing reasons, this court grants defendants' motion for summary judgment and enters judgment in favor of the defendants. The City of Chicago's motion to strike the official capacity claims against the individual defendants is denied as moot.

**ENTER:**

JOHN A. NORDBERG
Senior United States District Court Judge

DATED: October 15, 2001